## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KUNIHIKO KANNO, derivatively on behalf of MEDICAL PROPERTIES TRUST, INC., <br><br> Plaintiff, <br><br> v. <br><br> EDWARD K. ALDAG, JR., J. KEVIN HANNA, R. STEVEN HAMNER, G. STEVEN DAWSON, CATERINA A. MOZINGO, EMILY W. MURPHY, ELIZABETH N. PITMAN, D. PAUL SPARKS, JR., MICHAEL G. STEWART, and C. REYNOLDS THOMPSON, III, <br><br> Defendants, <br><br> and <br><br> MEDICAL PROPERTIES TRUST, INC., <br><br> Nominal Defendant. | Case No.: 1:23-cv-10934 <br><br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **INTRODUCTION**

Plaintiff Kunihiko Kanno ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Medical Properties Trust, Inc. ("Medical Properties," "MPT" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Edward K. Aldag, Jr. ("Aldag"), J. Kevin Hanna ("Hanna"), R. Steven Hamner ("Hamner"), G. Steven Dawson ("Dawson"), Caterina A. Mozingo ("Mozingo"), Emily W. Murphy ("Murphy"), Elizabeth N. Pitman ("Pitman"), D. Paul Sparks, Jr. ("Sparks"), Michael G. Stewart ("Stewart"), and C. Reynolds Thompson, III ("Thompson") (collectively, the "Individual Defendants" and together with Medical Properties, "Defendants") for breaches of their fiduciary duties as directors and/or officers of the Company, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); and against Defendants Aldag, Hamner, and Hanna for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the directors and officers of Medical Properties from May 23, 2023 to August 17, 2023, both dates inclusive (the "Relevant Period").

2.      Medical Properties is a real estate investment trust ("REIT") headquartered in Birmingham, Alabama that purchases and develops healthcare facilities both domestically and internationally. Founded in 2003 as a Maryland corporation, the Company has grown to become one of the world's largest hospital owners, boasting 44,000 licensed hospital beds across 444 facilities in 31 U.S. states, seven European countries, Australia, and Colombia. Medical Properties purchases and develops hospital facilities on a "net lease" basis, whereby the Company owns the buildings and land and leases the facilities to medical providers. The Company's facilities cover a variety of healthcare settings, including general acute care hospitals, behavioral health facilities, inpatient physical rehabilitation facilities, long-term acute care hospitals, and standalone emergency room/urgent care facilities.

3.      The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "MPW."

4.      In July 2019, the Company entered into an agreement with Prospect Medical Holdings, Inc. ("Prospect") to purchase fourteen hospitals and two behavioral care facilities for $1.55 billion. Following the purchase, the Company would own the facilities but lease them back to Prospect which is the standard business model of Medical Properties' sale-leaseback transactions.

5.      However, on February 23, 2023, the Company filed a Form 8-K with the SEC publicly revealing for the first time that Prospect *owed over $112 million* in rent to MPT.

6.      The Relevant Period begins on May 23, 2023 when Medical Properties issued a

press release announcing that it had entered into a recapitalization transaction (the "Recap Transaction") with Prospect. The Recap Transaction aimed to restructure the companies' relationship in an effort to help secure Prospect's financial position and provide MPT with a better security agreement. Per the Recap Transaction, the Company was granted an equity stake in Prospect's managed care business, PHP Holdings, LLC ("PHP"), in lieu of cash for any outstanding loans and accrued but unpaid rent and interest that Prospect owed to Medical Properties.

7.    Because PHP is a managed care business and was central to the deal, the Recap Transaction was subject to approval by the Department of Managed Health Care of the Health and Human Services Agency of the State of California ("DMHC"). The DMHC is the regulatory body charged with governing managed health care plans in the state of California.

8.    On July 20, 2023, the DMHC issued an order (the "DMHC Order") to put the Recap Transaction on hold in order to receive more information and understand the implications of the transaction. Yet, even in the face of the DMHC Order, Defendants failed to disclose to investors that the Company's highly touted deal had been put on hold and was at risk of regulatory dismissal. Indeed, the Company failed to disclose the DMHC Order in both the press release the Company issued on August 8, 2023 announcing its results for the second quarter of 2023 and in the Form 10-Q the Company filed with the SEC on August 9, 2023 (the "Q2 2023 Form 10-Q"). Instead, Defendants continued to emphasis the purported benefits of the Recap Transaction and its boost on the Company's revenue.

9.    The truth emerged on August 18, 2023 when the Wall Street Journal ("WSJ") published an article entitled "Cracks Deepen for America's Biggest Hospital Landlord: Struggling Tenants, a Bailout on Hold" (the "WSJ Article"). The WSJ Article revealed the

existence of the DMHC Order and the serious consequences that would occur if the Recap Transaction was permanently rejected.

10.    In response to the WSJ Article, the Company issued a press release rejecting the article's framing of the situation, instead describing the DMHC Order as a "standard, expected, and non-controversial part of the approval process for [the Recap Transaction]." Additionally, Defendants attempted to justify the Company's failure to disclose the DMHC Order to shareholders by characterizing it as "immaterial to [the Company's] financials" and further representing that it "thus did not require disclosure."

11.    On this news, the Company's stock price fell from a closing price of $7.50 per share on August 17, 2023 to a closing price of $6.93 per share on August 18, 2023. This represented a fall of $0.57 per share, or 7.6%.

12.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements and omissions about the true condition of the Company's assets, financial health, and overall business practices. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make to the investing public a series of materially false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Recap Transaction was subject to regulatory approval by the DMHC; (2) the DMHC had placed the Recap Transaction on hold; (3) accordingly, the Company had misrepresented the regulatory process for the approval of the Recap Transaction; (4) due to the foregoing, the Company overstated the approval prospects and benefits of the Recap Transaction; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all

relevant times.

13.     The Individual Defendants' misrepresentations had the effect of misleading the investing public and artificially inflating the Company's stock price during the Relevant Period.

14.     At all relevant times, the Individual Defendants further breached their fiduciary duties by causing the Company to fail to maintain effective disclosure controls and procedures and adequate internal controls.

15.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), Chairman of the Board, and President; its Chief Financial Officer ("CFO"); and its Chief Accounting Officer ("CAO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

16.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17.     Additionally, during the Relevant Period, the Individual Defendants caused the Company to repurchase 56,000 shares of Company common stock at artificially inflated prices, resulting in the Company overpaying by more than $132,160 for the shares.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of their collective engagement in fraud and misconduct, of the substantial likelihood of the directors' liability in this derivative action and

of Defendants Aldag's, Hamner's, and Hanna's liability in the Securities Class Action, of their being beholden to each other, of their longstanding business and personal relationships with each other, and of their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on the Company's behalf with the requisite level of disinterestedness and independence.

### JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

20.     This Court also has subject matter jurisdiction because Plaintiff's claims raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

21.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

24.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or has minimum contacts with this District to justify the exercise of jurisdiction over them.

6

25.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

26.     Plaintiff is a current shareholder of Medical Properties. Plaintiff has continuously held Company common stock since May 6, 2021. Plaintiff is a citizen of New York.

### Nominal Defendant Medical Properties

27.     Medical Properties is a Maryland corporation with its principal executive offices at 1000 Urban Center Drive, Suite 501, Birmingham, Alabama, 35242. The Company's common stock trades on the NYSE under the ticker symbol "MPW."

### Defendant Aldag

28.     Defendant Aldag has served as the Company's CEO and Chairman of the Board since 2004. Defendant Aldag co-founded the Company in 2003. He also serves as the Chair of the Investment Committee and as a member of the Environmental and Social Risk Committee. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 27, 2023 (the "2023 Proxy Statement"), as of March 29, 2023, Defendant Aldag beneficially owned 3,116,010 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2023 was $7.69, Defendant Aldag owned approximately $23,962,117 worth of Company stock at that time.

29.     For the fiscal year ended December 31, 2022 ("Fiscal Year 2022"), Defendant

Aldag received $16,025,513 in total compensation from the Company. This included $1,000,000 in salary, $600,000 in bonuses, $12,380,300 in stock awards, $1,900,000 in non-equity incentive plan compensation, and $145,213 in all other compensation.

30.     The 2023 Proxy Statement stated the following about Defendant Aldag:

The Board believes that Mr. Aldag's position as the founder of our Company, and his extensive experience in the healthcare and REIT industries, make him highly qualified to serve as Chairman of our Board.

Mr. Aldag launched our Company in 2003 as the nation's only REIT focusing exclusively on hospitals. Today, Medical Properties Trust is the established leader in the hospital REIT sector, with 444 facilities across the United States, Western Europe, South America, and Australia. Under Mr. Aldag's leadership, MPT's assets have grown to approximately $20 billion, and the Company has become the second largest U.S. based owner of hospital beds, with approximately 44,000 in its portfolio.

Mr. Aldag serves on the Board of Children's of Alabama, one of the nation's leading hospitals for children. He is Vice Chairman of the Alabama Children's Hospital Foundation and Chairman of the Foundation's Investment Committee. He also serves as a board member for Mitchell's Place, benefitting children with autism; the Birmingham Education Foundation, dedicated to increasing the number of students in Birmingham City Schools who are on the path to college, career and life readiness; the American Sports Medicine Institute, which works to understand, prevent and treat sports-related injuries; and serves as a member of the Executive Committee of the Birmingham Business Alliance. He is a guest lecturer at both the University of Alabama and the University of Alabama at Birmingham ("UAB") and part of the UAB President's Campaign Leadership Cabinet for a $1 billion campaign. In November 2017, he was selected as a member of the National Advisory Board of Governors for Nareit.

Mr. Aldag was appointed as a board member of Infracore SA in May 2019 and as a board member of Générale-Beaulieu Immobilière SA in June 2020, both private foreign companies. A native of Eufaula, Alabama, Mr. Aldag is a graduate of the University of Alabama, where he majored in finance.

31.     Upon information and belief, Defendant Aldag is a citizen of Alabama.

**Defendant Dawson**

32.     Defendant Dawson has served as a Company director since 2004. He also serves as the Chair of the Audit Committee and as a member of the Investment Committee. According

to the 2023 Proxy Statement, as of March 29, 2023, Defendant Dawson beneficially owned 123,336 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2023 was $7.69, Defendant Dawson owned approximately $948,454 worth of Company stock at that time.

33.     For Fiscal Year 2022, Defendant Dawson received $275,475 in total compensation from the Company. This included $150,000 in fees earned or paid in cash and $125,475 in stock awards.

34.     The 2023 Proxy Statement stated the following about Defendant Dawson:

> The Board believes that Mr. Dawson's substantial experience as a board member and committee chairman of other public REITs, along with his strong skills in corporate finance, strategic planning and public company oversight, make him a valued advisor and highly qualified to serve as a member of our Board and as Chairman of our Audit Committee.

> Since 2003, Mr. Dawson has primarily been a private investor focused on real estate and financial services in the U.S. and Canada and has served on the boards of numerous public and private REITs and other companies. From July 1990 to September 2003, he served as Chief Financial Officer and Senior Vice President – Finance of Camden Property Trust (and its predecessors) (NYSE: CPT), a REIT specializing in apartment communities based in Houston, Texas.

> Mr. Dawson currently serves on the Board of Directors and as Audit Committee chairman, as well as a member of the Nominating and Corporate Governance Committee and Compensation Committee for Cohen & Co. (NYSE American: COHN), a broker-dealer and an investment banking firm specializing in special purpose acquisition companies and credit-related fixed income investments in the U.S. and Europe. He is also the Chairman of the Board of Trustees for Nova Net Lease REIT (CSE: NNL-U.CN), a small Canadian company investing in specialty industrial properties in the U.S. Mr. Dawson holds a degree in business from Texas A&M University and is a member of the Real Estate Roundtable at the Mays Graduate School of Business at Texas A&M University.

35.     Upon information and belief, Defendant Dawson is a citizen of Alabama.

**Defendant Hamner**

36.     Defendant Hamner has served as a Company director since 2005 and as the Company's Executive Vice President and CFO since September 2003. He is also a member of the Investment Committee and the Risk Committee. According to the 2023 Proxy Statement, as of March 29, 2023, Defendant Hamner beneficially owned 1,795,283 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2023 was $7.69, Defendant Hamner owned approximately $13,805,726 worth of Company stock at that time.

37.     For Fiscal Year 2022, Defendant Hamner received $8,163,771 in total compensation from the Company. This included $675,000 in salary, $303,750 in bonuses, $6,190,172 in stock awards, $961,875 in non-equity incentive plan compensation, and $32,974 in all other compensation.

38.     The 2023 Proxy Statement stated the following about Defendant Hamner:

> The Board believes that Mr. Hamner's position as a co-founder of our Company, and his extensive experience in the real estate and healthcare industries and in the corporate finance sector, make him highly qualified to serve as a member of our Board.
>
> In August and September 2003, Mr. Hamner served as our Executive Vice President and Chief Accounting Officer. From October 2001 through March 2004, he was the Managing Director of Transaction Analysis LLC, a company that provided interim and project-oriented accounting and consulting services to commercial real estate owners and their advisors. From June 1998 to September 2001, he was Vice President and Chief Financial Officer of United Investors Realty Trust, a publicly traded REIT. For the 10 years prior to becoming an officer of United Investors Realty Trust, he was employed by the accounting and consulting firm of Ernst & Young LLP and its predecessors.
>
> Mr. Hamner received a B.S. in Accounting from Louisiana State University.

39.     Upon information and belief, Defendant Hamner is a citizen of Alabama.

**Defendant Hanna**

10

40.     Defendant Hanna serves as the Company's Senior Vice President, Controller and CAO and has served as a Company employee since 2008.

41.     The Company's website states the following about Defendant Hanna:

Before joining MPT in 2008, J. Kevin Hanna worked as controller of Fruit of the Loom, Inc., a Berkshire Hathaway subsidiary, and Russell Corp., a global consumer products company. He started his career in the Birmingham, Alabama, office of Ernst & Young LLP in 1995, where he spent eight years auditing public and private companies, primarily in the retail, distribution and consumer products industries. Hanna received a B.S. in accounting from the University of Alabama and is a certified public accountant. Hanna serves on the board of the American Cancer Society and is on the Executive Leadership Team of the American Heart Association Heart Walk. He and his wife, Julianne, have two daughters.

42.     Upon information and belief, Defendant Hanna is a citizen of Alabama.

**Defendant Mozingo**

43.     Defendant Mozingo has served as a Company director since February 2020. She also serves as the Chair of the Environmental and Social Committee and as a member of the Risk Committee. According to the 2023 Proxy Statement, as of March 29, 2023, Defendant Mozingo beneficially owned 26,396 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2023 was $7.69, Defendant Mozingo owned approximately $202,985 worth of Company stock at that time.

44.     For Fiscal Year 2022, Defendant Mozingo received $270,475 in total compensation from the Company. This included $145,000 in fees earned or paid in cash and $125,475 in stock awards.

45.     The 2023 Proxy Statement stated the following about Defendant Mozingo:

The Board believes that Ms. Mozingo's experience as a certified public accountant and consultant to real estate and healthcare companies, and her experience providing tax consulting services to for profit and not-for-profit companies, including publicly traded and privately held entities, make her highly qualified to serve as a member of our Board.

11

Ms. Mozingo is a tax partner with Aldridge, Borden & Company, P.C., a CPA firm that she joined in 1995. Her experience at Aldridge, Borden & Company includes a broad range of tax consulting and compliance services for businesses, individuals, fiduciaries, and tax-exempt entities. She began her career in public accounting with Coopers & Lybrand, LLP.

Ms. Mozingo is a member of the American Institute of CPAs, and the Alabama Society of CPAs, where she serves on the State Taxation Committee. Ms. Mozingo graduated *summa cum laude* from the University of Alabama in Commerce and Business Administration before earning a Master of Tax Accounting degree. Ms. Mozingo holds the Personal Financial Specialist designation awarded by the AICPA.

46.     Upon information and belief, Defendant Mozingo is a citizen of Alabama.

**Defendant Murphy**

47.     Defendant Murphy has served as a Company director since February 2022. She also serves as a member of the Ethics Committee, the Nominating and Corporate Governance Committee, and the Environmental and Social Committee. According to the 2023 Proxy Statement, as of March 29, 2023, Defendant Murphy beneficially owned 15,776 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2023 was $7.69, Defendant Murphy owned approximately $121,317 worth of Company stock at that time.

48.     For Fiscal Year 2022, Defendant Murphy received $207,538 in total compensation from the Company. This included $86,250 in fees earned or paid in cash and $121,288 in stock awards.

49.     The 2023 Proxy Statement stated the following about Defendant Murphy:

The Board believes that Ms. Murphy's legal background and extensive knowledge of managing the growth of large organizations make her a valued advisor and highly qualified to serve as a member of our Board.

Ms. Murphy is a leading expert in government contracting and government business. She served as Administrator of the U.S. General Services Administration ("GSA") from 2017 to 2021, leading a workforce of more than

11,000 federal employees and overseeing 371 million square feet of office space and $75 billion in annual contracts. During her time as GSA Administrator, she had ultimate supervisory authority of the Office of High-Performance Green Buildings, as established in 42 U.S. Code § 17092. She was a member of the Federal Acquisitions Security Committee, which dealt with risk management around IT and the IT supply chain. Under her leadership, GSA significantly increased its sales and revenues, saved customer agencies more than $20 billion and recorded the highest customer, vendor, and employee satisfaction scores in the history of the agency.

Before her service as the GSA Administrator, Ms. Murphy was GSA's first Chief Acquisition Officer during the administration of President George W. Bush, where she was responsible for more than $40 billion in acquisition programs. Prior to this, she served at the U.S. Small Business Administration as the Senior Advisor for Government Contracting and Business Development and as Acting Associate Administrator for Government Contracting. In addition to her senior roles in the Executive Branch, Ms. Murphy spent nine years serving in various procurement policy and leadership roles for the House of Representatives, including Counsel and Professional Staff Member to the Committee on Armed Services and Senior Counsel and Policy Director for the Committee on Small Business.

In the private sector, Ms. Murphy was the General Counsel and Vice President for Operations for TerreStar National Services, Inc., a wholly owned subsidiary of TerreStar Networks, and practiced government contracts law with the firm of Wiley, Rein & Fielding (now Wiley). She is a graduate of the University of Virginia School of Law and Smith College and is a member of the Young Presidents Organization, the Economic Club of Washington, D.C., and the Chief Executives Organization.

She currently serves as Senior Fellow with the Center for Government Contracting at George Mason University's School of Business. She works as a coach for high growth businesses with CEO Coaching International and serves on the Board of Advisors for SkillStorm and Vita Inclinata.

50.    Upon information and belief, Defendant Murphy is a citizen of Alabama.

**Defendant Pitman**

51.    Defendant Pitman has served as a Company director since 2018. She also serves as the Chair of the Nominating and Corporate Governance Committee, Chair of the Risk Committee, as a member of the Ethics Committee, and as a member of the Environmental and Social Committee. According to the 2023 Proxy Statement, as of March 29, 2023, Defendant

Pitman beneficially owned 46,984 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2023 was $7.69, Defendant Pitman owned approximately $361,307 worth of Company stock at that time.

52.     For Fiscal Year 2022, Defendant Pitman received $285,475 in total compensation from the Company. This included $160,000 in fees earned or paid in cash and $125,475 in stock awards.

53.     The 2023 Proxy Statement stated the following about Defendant Pitman:

The Board believes that Ms. Pitman's experience as a healthcare lawyer, and her experience providing counsel to publicly traded and privately owned hospitals and healthcare systems, make her highly qualified to serve as a member of our Board.

Ms. Pitman has been an attorney with Holland & Knight, LLP, formerly Waller, Landen, Dortch & Davis, LLP, known as leading provider of legal services to the healthcare industry, since 2015. From July 2013 to December 2013, she worked as corporate counsel for Vitera Healthcare Solutions, LLC, and prior to that, from October 2008 to July 2013, she served as general counsel at Success EHS, Inc., both providers of electronic health records and revenue cycle management solutions. Ms. Pitman has provided counsel to companies, hospitals and healthcare systems, surgery centers, physician groups and healthcare information technology companies on a variety of matters, including healthcare regulatory, privacy, data and cyber security compliance, technology licensing, and mergers and acquisitions.

Ms. Pitman earned a B.S. in Accounting from the University of Alabama and a Juris Doctorate from the University of Alabama School of Law.

54.     Upon information and belief, Defendant Pitman is a citizen of Alabama.

**Defendant Sparks**

55.     Defendant Sparks has served as a Company director since 2014. He also serves as a member of the Audit Committee, Compensation Committee, and Investment Committee. According to the 2023 Proxy Statement, as of March 29, 2023, Defendant Sparks beneficially owned 66,474 shares of the Company's common stock. Given that the price per share of the

Company's common stock at the close of trading on March 29, 2023 was $7.69, Defendant Sparks owned approximately $511,185 worth of Company stock at that time.

56.     For Fiscal Year 2022, Defendant Sparks received $255,475 in total compensation from the Company. This included $130,000 in fees earned or paid in cash and $125,475 in stock awards.

57.     The 2023 Proxy Statement stated the following about Defendant Sparks:

The Board believes that Mr. Sparks' substantial experience in executive positions, and his ability to guide companies through periods of growth and development, make him a valued advisor and qualified to serve as a member of our Board.

Mr. Sparks retired in January 2016 after a 32-year career in the energy industry. Prior to his retirement, he was Senior Vice President of Resource Development for Energen Resources Corporation (NYSE: EGN), holding various positions with Energen since 1989, including Senior Vice President of Operations from 2006 until 2012. During his 27 years at Energen, Mr. Sparks helped Energen grow from a small, regulated utility to a top 20 independent oil and gas exploration and production company in the U.S. Mr. Sparks was responsible for the forward-looking strategy and implementation of valuing and developing the assets of Energen Resources Corporation. Prior to joining Energen, Mr. Sparks worked with Amoco Corporation, a global chemical and oil company in Texas and Louisiana.

Mr. Sparks has been active in a number of organizations. He is the former Chairman of the New Mexico Oil and Gas Association, past advisor to the Gas Research Institute, a former board member of the Independent Petroleum Association of America and past officer of the Society of Petroleum Engineers. He has authored a number of peer-reviewed publications and holds a patent in oil and gas technology. Mr. Sparks is a 1984 graduate of Mississippi State University with a degree in Petroleum Engineering. He is also a Bagley College of Engineering Distinguished Fellow and a member of the College's Advisory Board.

58.     Upon information and belief, Defendant Sparks is a citizen of Alabama.

**Defendant Stewart**

59.     Defendant Stewart has served as a Company director since 2016. He also serves as a member of the Environmental and Social Committee, Compensation Committee,

Nominating and Corporate Governance Committee, and Ethics Committee. According to the 2023 Proxy Statement, as of March 29, 2023, Defendant Stewart beneficially owned 224,111 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2023 was $7.69, Defendant Stewart owned approximately $1,723,414 worth of Company stock at that time.

60.     For Fiscal Year 2022, Defendant Stewart received $290,475 in total compensation from the Company. This included $165,000 in fees earned or paid in cash and $125,475 in stock awards.

61.     The 2023 Proxy Statement stated the following about Defendant Stewart:

The Board believes that Mr. Stewart's legal background, and his extensive knowledge of healthcare, legal and corporate governance and addressing various healthcare issues, make him a valued advisor and highly qualified to serve as a member of our Board.

Mr. Stewart is presently a private investor. He served as Executive Vice President, General Counsel and Secretary of the Company from 2005 – 2010. Mr. Stewart formerly worked with law firms Berkowitz, Lefkovits, Isom & Kushner (now Baker Donelson) and Constangy, Brooks & Smith, having a law practice that encompassed corporate, healthcare, litigation, employment, and labor. Mr. Stewart also served as Vice President and General Counsel of Complete Health Services, Inc. (later, United Healthcare of the South). Throughout his professional career, he has provided private consulting services to physician groups and other healthcare providers. Mr. Stewart is the author of four novels that have been published by G.P. Putnam's Sons and Random House.

He is a graduate of Auburn University with a B.S. degree in Business Administration with an emphasis in Information Systems and received his Juris Doctorate degree from the Cumberland School of Law at Samford University.

62.     Upon information and belief, Defendant Stewart is a citizen of Alabama.

**Defendant Thompson**

63.     Defendant Thompson has served as a Company director since 2016. He also serves as Chair of the Compensation Committee, as a member of the Audit Committee, and as a

member of the Investment Committee. According to the 2023 Proxy Statement, as of March 29, 2023, Defendant Thompson beneficially owned 45,253 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2023 was $7.69, Defendant Thompson owned approximately $347,996 worth of Company stock at that time.

64.     For Fiscal Year 2022, Defendant Thompson received $270,475 in total compensation from the Company. This included $145,000 in fees earned or paid in cash and $125,475 in stock awards.

65.     The 2023 Proxy Statement stated the following about Defendant Thompson:

The Board believes that Mr. Thompson's significant executive experience, and his deep understanding of all aspects of REITs, make him a valued advisor and well qualified to serve as a member of our Board.

Mr. Thompson has served as Chairman and Chief Investment Officer of Select Strategies Realty of Cincinnati ("Select"), a privately held real estate investment company that specializes in the development, acquisition, management, and leasing of retail and mixed-use real estate in Midwestern and Southeastern U.S. since 2014. Select has sponsored retail investments in excess of $400 million and has provided management and leasing services for over five million retail square feet. Founded in 2005, the firm has 7 offices along with its Cincinnati headquarters. The company manages and leases retail assets in nine states as well as office and multifamily assets in Ohio and Kentucky. Prior to joining Select, Mr. Thompson was President and Chief Financial Officer (1997 – 2013) of Colonial Properties Trust, a $4 billion publicly traded REIT with a portfolio of multifamily, office, retail, and mixed-use assets. During a 16-year career with Colonial, he also served as CEO, COO and CIO. He served on Colonial's risk management committee and was part of reviewing and maintaining the Colonial's business continuity plan. He has extensive public company management, operating and investment experience having raised $950 million in equity, $2.5 billion in debt and completed acquisitions totaling $3 billion. Prior to this, Mr. Thompson worked in acquisitions and due diligence for Carr America Realty Corporation, a then publicly traded REIT. Mr. Thompson began his career as a commercial lending officer at SunTrust Bank (now Truist Bank).

Mr. Thompson is a member of the Board of Visitors of the Culverhouse College of Business at the University of Alabama. He previously served on the Board of Governors of Nareit, and the board of directors of the Birmingham Business

Alliance and United Way of Central Alabama. Mr. Thompson holds a B.S. degree with Special Attainments in Commerce from Washington and Lee University.

66.    Upon information and belief, Defendant Thompson is a citizen of Alabama.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

67.    By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the Company's business and corporate affairs, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

68.    Each director and officer owes the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

69.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

70.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

71.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The

18

conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of the Board at all relevant times.

72.     As the senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

73.     To discharge their duties, the Company's officers and directors were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the Company's officers and directors were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent

manner in accordance with the laws and regulations of Maryland and the United States, and pursuant to the Company's own Code of Ethics and Business Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other

financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

74.     Each of the Individual Defendants further owed to the Company and the shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

75.     At all times relevant hereto, the Individual Defendants were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

76.     Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

77.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

78.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

79.     The purpose and effect of the conspiracy, common enterprise, and/or common

course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

80.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of the Company was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

81.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of their overall contribution to and furtherance of the wrongdoing.

82.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

## MEDICAL PROPERTIES' CODE OF BUSINESS CONDUCT AND CORPORATE GOVERNANCE

### *Medical Properties' Code of Conduct*

83.     The Code of Conduct, as revised in April 2023 and in its first section titled "Purpose," states that the Company was "amending and restating" the Code of Conduct "for the purpose of deterring wrongdoing and promoting" the following:

- Honest and ethical conduct, including ethical handling of conflicts of interest, anti-corruption, and bribery;

- Full, fair, accurate, timely and understandable disclosure in the Company's filings with the Securities and Exchange Commission, from and after the time the Company is required to make such filings, and other public communications;

- Compliance with applicable laws, rules and regulations;

- Prompt reporting of violations of the Code; and

- Accountability for adherence to the Code.

84.     In its second section, titled "Honest and Ethical Conduct," the Code of Conduct states the following, in relevant part:

> Each director, officer, employee owes a duty to the Company to act in an honest and ethical manner and to abide by the letter and the spirit of all applicable laws, rules and regulations applicable wherever the Company does business. All directors, officers and employees of the Company are expected to be familiar with the Code and to adhere to those principles and procedures set forth in the Code that apply to them.

> The Company's Audit Committee of the Board of Directors (the "Audit Committee") is responsible for administering and interpreting the Code. The Audit Committee has delegated day-to-day responsibility for administrating and interpreting the Code to the Code of Ethics Contact Person. For purposes of this Code, the "Code of Ethics Contact Person" will be the Chief Operating Officer.

85.     Regarding conflicts of interest, the Code of Conduct states that "[d]irectors, officers and employees should conduct themselves in a manner that avoids even the appearance of a conflict of interest."

23

86.     Regarding "Compliance," the Code of Conduct states "[i]t is the Company's policy to comply with all applicable laws, rules and regulations. Each director, officer and employee is responsible for adhering to the standards and restrictions imposed by those laws, rules and regulations."

87.     Regarding "Insider Trading," the Code of Conduct states the following:

In the normal course of business, directors, officers and employees may have access to information that is not known to the public. Sometimes this inside information may also "materially" affect the market for the Company's stock. Directors, officers and employees with material inside information are subject to severe legal consequences for buying or selling, or for disclosing this information to others who buy or sell, Company stock before the information is public.

The courts say that information is material if there is a substantial likelihood that a reasonable investor would consider the information important in deciding whether or not to buy, sell or hold a company's securities. Directors, officers and employees may not act on this information or release it to anyone else, including relatives, friends, coworkers or stockbrokers, until this information has been disclosed publicly and the public has had time to react to it. Always consult the Company's Chief Executive Officer, Chief Financial Officer or Code of Ethics Contact Person before buying or selling Company stock if any doubt exists concerning the materiality of the information in your possession.

88.     Regarding "Public Company Reporting," the Code of Conduct states the following:

It is of critical importance that the Company's filings with the Securities and Exchange Commission ("SEC") and related public disclosures be accurate and timely. Depending on his or her position with the Company, a director, officer or employee may be called upon to provide necessary information to assure that the Company's public reports are complete, fair and understandable. The Company expects directors, officers and employees to take their responsibility very seriously and to provide prompt, accurate answers to inquiries related to the Company's public disclosure requirements.

89.     In its fourth section, titled "Sanctions; Disciplinary Actions," the Code of Conduct states the following:

We expect everyone subject to this Code to act with the highest integrity and we are committed to acting professionally, fairly and with integrity in all our business

dealings and relationships.

Violations of this code will not be condoned. Any employee who breaches this policy may face disciplinary action, which could result in dismissal for gross misconduct. Any non-employee who breaches this policy may have their contract terminated with immediate effect.

90.     Regarding "Oversight, Reporting and Protection," the Code of Conduct also provides that "[t]he Audit Committee shall take all action they consider appropriate to investigate any violations reported to them. If a violation has occurred, the Company will take such disciplinary or preventive action as it deems appropriate, after consultation with the Audit Committee."

### *Medical Properties' Corporate Governance Guidelines*

91.     Medical Properties' Corporate Governance Guidelines (the "Guidelines") outline several responsibilities of the Board of Directors. Under the section "Director Responsibilities," the Guidelines state the following, in relevant part:

> The basic responsibility of the directors is to direct the management of the business and affairs of the Company and, in doing so, to exercise their business judgment and to act in a manner that they reasonably believe to be the best interests of the Company and its stockholders. In discharging that obligation, directors should be entitled to rely on the honesty and integrity of the Company's senior management and its outside advisors and auditors. Generally, the directors should be entitled to have the Company purchase directors' and officers' liability insurance on their behalf, to the benefits of indemnification to the fullest extent permitted by law and the Company's charter, bylaws and any indemnification agreements, and to exculpation as provided by state law and the Company's charter.

92.     Regarding "Director Qualifications," the Guidelines state the following, in relevant part:

> Directors should (i) possess the highest personal and professional ethics, integrity, and values; (ii) have, or demonstrate an ability and willingness to acquire in short order, a clear understanding of the Company's business; (iii) be committed to representing the long-term interests of the Company's stockholders; and (iv) be willing to devote sufficient time to carry out their duties and

responsibilities effectively and be committed to serving on the Board of Directors for an extended time.

### *Medical Properties' Audit Committee Charter*

93.     Under a section titled "Purpose," Medical Properties' Charter of the Audit Committee (the "Audit Committee Charter") states that the Audit Committee "will assist the Board of Directors . . . in fulfilling its oversight responsibilities" of:

(1)     The integrity of the Company's financial statements;

(2)     The Company's compliance with legal and regulatory requirements;

(3)     The independent auditor's qualifications and independence; and

(4)     The performance of the Company's internal audit function and independent auditors.

94.     In the same section, the Audit Committee Charter states the following, in relevant part:

> The Committee will also assist the Board in monitoring the Company's compliance with the Code of Ethics and Business Conduct and in overseeing the Company's system of disclosure controls and procedures and internal controls over financial reporting.

95.     In a section titled "Duties and Responsibilities," the Audit Committee Charter describes the Audit Committee's specific responsibilities, stating the following, in relevant part:

- The Committee shall discuss with management and independent auditors significant financial reporting issues and judgments made in connection with preparation of the Company's financial statements, including significant changes in the selection or application of accounting principles, major issues as to the adequacy of internal controls, and any special steps adopted in light of material control deficiencies;

- The Committee shall review and discuss with management and the independent auditors the annual audited financial statements and quarterly financial statements, including the Company's specific disclosures in Management's Discussion and Analysis of Financial Condition and Results of Operations and the results of the independent auditor's reviews

of the quarterly financial statements, and recommend to the Board whether the annual audited financial statements should be included in any Form 10-K to be filed by the Company;

- The Committee shall discuss with management and the independent auditor the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analyst and rating agencies. Such discussion may be done generally (consisting of discussing the types of information to be disclosed and the types of presentations to be made);

- The Committee shall discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies;

- The Committee shall review any significant matters contained in reports prepared by the internal auditing department and meet privately with the internal audit manager each quarter to discuss concerns relating to internal controls or accounting and auditing matters;

- The Committee shall meet with Company senior management periodically to review: major financial risk exposures; material legal issues; plans for disaster recovery, risk management activities, business issues which may affect financial results, ethical standards and conduct, Management Information Systems activities;

- The Committee shall discuss with management the Company's major financial risk exposure and the steps management has taken to monitor and control such exposure, including the Company's risk assessment and risk management policies;

- The Committee shall monitor compliance of the Company's employees with its standards of business conduct and conflict of interest policies and review reports and disclosures of insider and affiliated party transactions.

96.    The Individual Defendants violated the Code of Conduct, the Guidelines, and the Audit Committee Charter by engaging in or permitting the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of

corporate assets, violations of the Exchange Act, and failing to report the same. Moreover, five of the Individual Defendants violated the Code of Conduct by engaging in insider trading. In further violation of the Code of Conduct, the Guidelines, and the Audit Committee Charter, the Individual Defendants failed to maintain internal controls, failed to maintain the accuracy of Company records and reports, failed to comply with applicable laws and regulations, and failed to conduct business in an honest and ethical manner.

97. In violation of the Audit Committee Charter, Defendants Dawson (as chair), Sparks, and Thompson (the "Audit Committee Defendants") conducted little, if any, oversight of Medical Properties' engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, in further violation of the Audit Committee Charter, the Audit Committee Defendants failed to adequately oversee major issues regarding the Company's accounting principles and financial statement presentations and major issues related to the adequacy of the Company's internal controls, including the Company's internal control over financial reporting and disclosure controls and procedures.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Background*

98. Medical Properties was incorporated in Maryland in 2003 as an REIT and is headquartered in Birmingham, Alabama. The Company's business model centers on acquiring and developing healthcare facilities and leasing those facilities to medical companies under long-

term net leases. These leases generally mandate that the tenant shoulder a majority of the costs affiliated with the leased property.

99.     Although Medical Properties maintains 100% ownership of the majority of its leased assets, the Company also owns many of its properties through joint ventures with other partners. Indeed, in some instances, the Company furnishes mortgage loans to healthcare companies which are collateralized by the Company's real estate assets. In other instances, the Company provides healthcare companies with loans through taxable REIT subsidiaries ("TRS"), the proceeds of which are typically used for working capital and other purposes.

100.    Moreover, Medical Properties sometimes extends noncontrolling investments in its tenants as investments in unconsolidated operating entities. This type of investment is generally made together with bigger real estate deals with the tenant that permit Medical Properties to share in the tenant's profits and losses and also provide the Company with certain minority rights and protections.

101.    This business model allows Medical Properties to complete acquisitions and recapitalizations and strives to achieve the Company's purported goal of "allow[ing] operators of healthcare facilities to serve their communities by unlocking the value of their real estate assets to fund facility improvements, technology upgrades, and other investments in operations."

102.    In February 2023, it was revealed that Prospect, the Company's third largest lessee, was failing to make rent payments. In an effort to rectify the situation, at the start of the Relevant Period, Medical Properties and Prospect entered into the Recap Transaction as a means of creating economic stability for each party.

103.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false

and misleading statements and omissions about the true condition of the Company's assets, financial health, and overall business practices. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make to the investing public a series of false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Recap Transaction was subject to regulatory approval by the DMHC; (2) the DMHC had placed the Recap Transaction on hold; (3) accordingly, the Company had misrepresented the regulatory process for the approval of the Recap Transaction; (4) due to the foregoing, the Company overstated the approval prospects and benefits of the Recap Transaction; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### False and Misleading Statements Made During the Relevant Period

104.    On May 23, 2023, the Company issued a press release in which it announced the Recap Transaction. The press release stated the following about the Recap Transaction:

> Medical Properties Trust, Inc. (the "Company" or "MPT") (NYSE: MPW) today announced that affiliates of Prospect Medical Holdings ("Prospect") have completed $375 million in new financings from third-party lenders, the proceeds of which will be used to provide Prospect's hospital operations with liquidity and capitalize its managed care business for continued growth and value creation in a vibrant market for such businesses.
>
> Prospect's $250 million asset-backed revolving credit facility has been repaid in full and as a result, the unencumbered borrowing base of government and commercial insurance accounts receivable will provide first lien security for the previously announced MPT delayed draw term loan of up to $75 million. Prospect is expected to be substantially free of material debt or lease obligations outside of those to MPT and this new third-party financing.
>
> MPT continues to have strong conviction in the embedded value of the Prospect platform and has structured its master leases and security agreements to provide collateral value in addition to its real estate interests, including interests in the equity of Prospect's managed care business. As of the end of the first quarter of 2023, MPT holds $1.6 billion in total assets related to Prospect that are expected to be reconstituted as follows:

- An approximately $513 million investment in six leased California hospitals, subject to a master lease scheduled to resume partial rent payments in September and full rent payments at an 8.44% cash yield in March of 2024;
- A $457 million investment in MPT's Connecticut real estate which, as previously announced, Yale New Haven Health is expected to acquire in a transaction that is expected to close during 2023's third quarter. MPT's investment is expected to be fully recovered through cash proceeds of $355 million at closing and equity interests in Prospect's managed care business valued at $103 million;
- A first lien mortgage loan of $150 million and equity interests in the managed care business valued at $100 million, resulting from the transfer to Prospect of Pennsylvania real estate with a book value of $250 million;
- Loans aggregating approximately $264 million and accrued rent and interest of approximately $56 million, along with the previously announced $50 million convertible loan to the managed care entities are expected to be recovered through equity interests in the managed care business.

The new loan agreements among Prospect, MPT and third-party lenders have terms of approximately three years. During this period, Prospect intends to further build the value of its managed care business and continue operational and financial improvements of its hospital operating business.

105. Just under a month later, however, on July 20, 2023, the DMHC issued the DMHC Order, effectively halting the Recap Transaction until the organization obtained further information from the Company.

106. Yet, despite the DMHC Order, Defendants failed to disclose to investors that the Recap Transaction had been put on hold. Instead, in a press release issued on August 8, 2023, which announced the Company's second quarter 2023 ("Q2 2023") financial and operating results, the Company stated:

NFFO for the second quarter ended June 30, 2023 was $285 million ($0.48 per diluted share) compared to $275 million ($0.46 per diluted share) in the year earlier period. Included in 2023 second quarter *NFFO is roughly $68 million ($0.11 per diluted share) from the receipt of equity in PHP in lieu of cash for 2023 previously unrecorded but contractually owed rent and interest revenue from Prospect Medical Holdings, Inc. ("Prospect"). In accordance with accounting requirements, the value of MPT's investment in PHP was established*

> ***at roughly $655 million based on estimates from multiple independent third parties and the application of an appropriate marketability discount.***
>
> The Company is narrowing its 2023 calendar estimate of per share net income to $0.33 to $0.37 to account for second quarter results and is also narrowing its estimate of per share NFFO to $1.53 to $1.57. The ranges include Prospect-related income from the expected resumption of partial California rental payments, recognition of the PHP equity value received in the second quarter and other amounts. The estimates are based on an existing portfolio which includes the impact of binding disposition and leasing transactions and excludes expected future contributions from development and other capital projects.

(Emphasis added.)

107.    Also on August 8, 2023, the Company hosted an earnings conference call with investors and analysts to discuss the Company's Q2 2023 results (the "Q2 2023 Earnings Call"). With regards to the Recap Transaction during the scripted portion of the call, Defendant Hamner stated the following, in relevant part:

> […] we recognized about $68 million in Prospect rent and interest. This is based on the previously disclosed Prospect recapitalization transactions that included our exchange of certain real estate and other assets for interest in Prospects managed care business.
>
> In brief summary, you will recall our May 23rd announcement that as of the end of the first quarter, we carried those assets at approximately $573 million. After obtaining updated valuations and an appraisal to determine marketability discounts, the estimated value of our interest in managed care as of the May closing was approximately $655 million. That's in addition to our roughly $515 million of leased California hospitals and $355 million of cash that we expect to collect from the sale to Yale of our Connecticut hospitals. Accordingly, we recognized in the second quarter the rent and interest that would have been collected in 2023 through the May closing date.

108.    The following day, on August 9, 2023, the Company filed a quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2023 (the "Q2 2023 10-Q"). In the Q2 2023 10-Q, the Company once again failed to disclose that the DMHC had placed the Recap Transaction on hold. Rather, in discussing the Company's new investments, the Q2 2023 10-Q instead stated:

On May 23, 2023, Prospect completed its recapitalization plan, which included receiving $375 million in new financing from several lenders. Along with this new debt capital from third-party lenders, we agreed to the following restructuring of our $1.7 billion investment in Prospect including: a) maintaining the master lease covering six California hospitals with no changes in rental rates or escalator provisions, and with the expectation that Prospect will begin making cash payments for a substantial portion of the contractual monthly rent due on these California properties starting in September 2023, b) transition the Pennsylvania properties back to Prospect in return for a first lien mortgage on the facilities, c) provide up to $75 million in a loan secured by a first lien on Prospect's accounts receivable and certain other assets, of which we funded $25 million on May 23, 2023, d) complete the previously disclosed sale of the Connecticut properties to Yale New Haven ("Yale"), as more fully described in <u>Note 9</u> to the condensed consolidated financial statements, and e) obtain a non-controlling ownership interest in PHP Holdings of approximately $654 million, after applying a discount for lack of marketability, consisting of an approximate $68 million equity investment and $586 million loan convertible into equity of PHP Holdings (collectively, the "Prospect Transaction"). This non-controlling ownership interest was received in exchange for unpaid rent and interest through December 2022, previously unrecorded rent and interest revenue in 2023 totaling approximately $68 million, our $151 million mortgage loan on a California property, our $112.9 million term loan, and other obligations at the time of such investment.

At June 30, 2023, we believe our remaining investment in the Prospect real estate and other assets are fully recoverable, but no assurances can be given that we will not have any further impairments in future periods.

109.    Attached to the Q2 2023 10-Q as an exhibit were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Aldag and Hamner, attesting that the "information contained in the [Q2 2023 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

110.    The statements identified in ¶¶104 and 106-109 were materially false and misleading when made because Defendants filed to disclose: (1) the Recap Transaction was subject to regulatory approval by the DMHC; (2) the DMHC had placed the Recap Transaction on hold; (3) accordingly, the Company had misrepresented the regulatory process for the approval of the Recap Transaction; (4) due to the foregoing, the Company overstated the approval prospects and benefits of the Recap Transaction; and (5) the Company failed to

maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

111.   The truth emerged on August 18, 2023 when WSJ published an article entitled "Cracks Deepen for America's Biggest Hospital Landlord: Struggling Tenants, a Bailout on Hold." The article revealed the truth about the DMHC Order, publicly disclosing for the first time that the DMHC had placed the transaction between the Company and Prospect on hold.

112.   The WSJ Article stated the following, in relevant part:

The nation's largest hospital landlord said an unusual transaction that provided crucial financial support for one of its biggest tenants was a done deal. It wasn't.

The deal was good news for both companies, and for communities across the country concerned that their local hospitals could go broke. The landlord, [MPW], announced the transaction in May. When it reported quarterly results on Aug. 8, it said the arrangement boosted its own revenue.

But a California state regulator on July 20 ordered that the transaction between [MPW] and Prospect [] be put on hold, according to the order that the regulator sent to Prospect. [MPW] didn't disclose the regulator's order when it reported second quarter results, or in its quarterly report filed the next day with the [SEC].

An [MPW] spokesman, Drew Babin, said: "Information is being provided to the relevant agencies, and [MPW] continues to expect to complete the transactions."

\*        \*        \*

The Prospect deal was designed to alleviate financial stress for both it and [MPW]. Before the deal, Prospect had stopped paying rent, closed two hospitals near Philadelphia, and owed [MPW] hundreds of millions of dollars. [MPW's] own finances are under scrutiny by investors, its shares are down by half over the past year, and it has already suffered large losses on Prospect, its third-largest tenant. If the deal is killed by regulators, it would further pressure the two companies' finances.

\*        \*        \*

[MPW] announced the deal with Los Angeles-based Prospect on May 23, saying it would receive equity in Prospect's managed-care business—[PHP]—in lieu of cash payment for $573 million of loans, unpaid rent and interest, and other amounts owed. [PHP] owns a small health insurer, Prospect Health Plan, as well as other businesses.

34

[MPW] didn't disclose whether the transaction with closely held Prospect would require regulatory approval. Last week [MPW] said it owned 49% of [PHP].

It isn't clear how Prospect would pay [MPW] if the regulator, the [DMHC], rejected the deal permanently. The department oversees Prospect Health Plan.

Kevin Durawa, a department spokesman, said the regulator is reviewing the matter and doesn't have a statutory time frame for making a decision. "The department's review includes the plan's decision to move forward with this transaction before the department's approval," he said.

The [*WSJ*] obtained the [DMHC Order] and other documents from the California regulator through requests under the state's Public Records Act.

Prospect said it was "in no position right now" to answer questions about the [DMHC Order]. The company has been crippled by a ransomware attack that was announced Aug. 3 and took out all of its computer systems, causing emergency room closures and forcing hospital staff to use paper records. Prospect said that emergency departments have reopened but that it doesn't know when all of its systems will be restored.

Babin, the [MPW] spokesman, said the deal is "proceeding through a normal regulatory review process that was expected and is not controversial." He said the company expects the deal to be approved.

*        *        *

Now, with interest rates higher and money tighter, [MPW] is shrinking. [MPW] has been extending financial support to some of its most-troubled tenants, including Prospect and Steward Health Care. Steward, a for-profit hospital operator based in Dallas, accounted for $3.7 billion, or 19%, of [MPW's] assets as of June 30 and is [MPW's] largest tenant. Prospect and [PHP] together accounted for $1.7 billion, or 9%, of [MPW's] assets.

[MPW] shares fell sharply last week after the company said it lent $140 million to Steward during the current quarter—part of a larger credit package that included other lenders. [MPW] already had more than $500 million of other loans to Steward, which is closely held, plus a $126 million equity investment. On Thursday, [MPW] said it had sold $105 million of the new loan to an unnamed investment firm.

*        *        *

[MPW's] shares trade at 54% of book value. [MPW] has been borrowing to help pay its dividend, which exceeded operating cash flow in each of the past two quarters. The stock has a 15.5% dividend yield, reflecting concern that the payout might not be sustainable.

[MPW] and Prospect have provided different descriptions, at different points in time, of the details of their deal. The California regulator appears to be concerned about how much control [MPW] would have over Prospect Health Plan. The deal is unusual in part because [MPW], a REIT, would get a big stake in a health insurer.

When the deal was announced, [MPW] didn't say what its percentage ownership of [PHP] would be. Prospect Health Plan has about 73,000 managed-care enrollees in five Southern California counties. [PHP's] other businesses include physician practice groups.

Prospect Health Plan notified the California regulator of the [Recap Transaction] in a June 23 filing that said an [MPW] subsidiary had "acquired a 49% equity interest" in [PHP], the health plan's parent, on May 23. The health plan said [MPW] acquired its stake by converting $370 million of loans, unpaid rent and interest, and other amounts owed by Prospect Medical Holdings into equity in [PHP]. The health plan called [MPW] a passive investor. It said the deal wasn't a change of control and didn't need the regulator's advance approval.

"The equity interests acquired by [MPW] are not 'voting' interests, although [MPW] was granted blocking rights with respect to certain major decisions" of [PHP], the health plan said. The June 23 filing didn't provide details about the blocking rights.

The [DMHC] on July 20 issued the [DMHC Order] putting the deal on hold. It characterized the deal's terms as "proposing a change of control." The [DMHC] said the order would "remain in effect until revoked or superseded by further order of the director." In an accompanying letter, the regulator said the order "prohibits the plan from implementing the terms" until further notice, because the health plan's proposal "does not demonstrate compliance" with state law.

The [DMHC] also sent the health plan a 12-page list of comments and requests for information. It asked for "a thorough description of the blocking rights," and an explanation of "the circumstances when [MPW] may exercise those blocking rights." The health plan's responses are due Sept. 13, after the regulator granted a deadline extension.

Asked to describe the blocking rights, Babin, the [MPW] spokesman, said "these are standard in any partnership agreement where a significant equity ownership interest exists and the specifics are confidential."

When [MPW] reported second-quarter results last week, its description of the equity deal differed significantly from its previous explanation in May—and from what Prospect Health Plan told the [DMHC] in June.

When [MPW] last week said it had taken a 49% equity interest in [PHP], that percentage figure matched what the health plan had said. [MPW], however, said its "non-controlling ownership interest" was worth $654.5 million as of June 30—based on updated valuations—and consisted of "an approximate $68 million equity investment and $586 million loan convertible into equity of [PHP]." The valuation exceeded the $370 million of Prospect obligations that the health plan in its June 23 filing had said was converted into equity.

The Prospect deal helped [MPW's] income statement, too. [MPW] said it recorded its receipt of the $68 million equity investment as revenue; that was 20% of its second-quarter revenue. Asked what [MPW's] rationale was for recognizing revenue in light of the [DMHC Order], Babin said "this is governed by accounting regulations."

As a regulated insurer, Prospect Health Plan files financial reports publicly. Other businesses owned by [PHP] don't, making it difficult for outsiders to gauge the unit's value. For the fiscal year ended Sept. 30, 2022, Prospect Health Plan reported net income of $1.9 million, total assets of $30.7 million and total equity of $14.2 million.

113.    In response to the WSJ Article, the Company issue a press release emphasizing that the DMHC Order was a "standard, expected, and non-controversial part of the approval process for [the Recap Transaction]." Additionally, the press release attempted to excuse the decision of the Defendants to not disclose the DMHC Order to shareholders by stating that the "DMHC's request was deemed immaterial to [the Company's] financials and thus did not require disclosure."

114.    On this news, the Company's stock price fell by $0.57 per share, or 7.6%, from closing at $7.50 per share at the closing of trade on August 17, 2023, to close at $6.93 per share at the closing of trade on August 18, 2023.

**REPURCHASES**

115.    During the Relevant Period, the Individual Defendants cause the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the

Company spent approximately $520,240 to repurchase 56,000 shares of its common stock at artificially inflated prices between May 2023 and August 2023.

116.    According to the Form 10-Q the Company filed with the SEC on November 9, 2023 for the quarter ended September 30, 2023, between July 1, 2023 and July 31, 2023, the Company purchased 56,000 shares of its common stock for approximately $520,240 at an average price of $9.29 per share.

117.    As the Company's stock was actually worth only $6.93, the price at closing on August 18, 2023, the Company overpaid by approximately $132,160 for repurchases of its own stock between July 1, 2023 and July 31, 2023.

118.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $132,160.

## DAMAGES TO MEDICAL PROPERTIES

119.    As a direct and proximate result of the Individual Defendants' misconduct, Medical Properties has lost and expended and will continue to lose and expend many millions of dollars.

120.    Such expenditures include, but are not limited to, the fees associated with the Securities Class Action, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

121.    Such losses include the Company's overpayment for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

122.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against

the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

123.   Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

124.   Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

125.   As a direct and proximate result of the Individual Defendants' conduct, Medical Properties has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

126.   Plaintiff brings this action derivatively and for the benefit of Medical Properties to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Medical Properties, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

127.    Medical Properties is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

128.    Plaintiff is, and has been at all relevant times, a shareholder of Medical Properties. Plaintiff will adequately and fairly represent the interests of Medical Properties in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

129.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

130.    A pre-suit demand on the Board of Medical Properties is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Aldag, Dawson, Hamner, Mozingo, Murphy, Pitman, Sparks, Stewart, and Thompson (the "Directors"). Plaintiff needs only to allege demand futility as to five of nine Directors who are on the Board at the time this action is commenced.

131.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

132.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the foregoing scheme. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Directors caused

the Company to fail to maintain internal controls over financial reporting and to fail to maintain effective disclosure controls and procedures. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

133.    Each of the Directors, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by approximately $132,160 for its own common stock during the Relevant Period. The Directors, as alleged herein, were aware of should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

134.    Additional reasons that demand on Defendant Aldag is futile follow. Defendant Aldag is a co-founder of the Company and has served as the Chairman of the Board, CEO, and President since the Company's inception in 2003. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Aldag with his principal occupation for which he receives substantial compensation. As the Company's highest and most trusted officer and director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, he personally made the statements in the August 9, 2023 earnings conference call and signed the Q2 2023 10-Q, both of which contained false and misleading statements. Moreover, Defendant Aldag is a defendant in the Securities Class Action. For these reasons, Defendant Aldag breached his fiduciary duties, faces a substantial likelihood of liability,

41

is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

135.    Additional reasons that demand on Defendant Dawson is futile follow. Defendant Dawson has served as a Company director since 2004.  He also serves as Chair of the Audit Committee and as a member of the Investment Committee. As a trusted director throughout the Relevant Period, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also receives handsome compensation from the Company. Moreover, he served as a member of Medical Properties' Audit Committee and, in that capacity, he failed to oversee, *inter alia*, the integrity of the Company's financial statements, the Company's internal control over financial reporting, and the effectiveness of its disclosure controls and procedures, as he was required to do under the Audit Committee Charter. For these reasons, Defendant Dawson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

136.    Additional reasons that demand on Defendant Hamner is futile follow. Defendant Hamner has served as a Company director since 2005 and as the Company's Executive Vice President and CFO since 2003. Therefore, as the Company admits, he is a non-independent director. He also currently serves as a member of the Investment Committee and the Risk Committee. In addition, he receives substantial compensation for his role as detailed above. Moreover, Defendant Hamner is a defendant in the Securities Class Action. As a trusted Company director and the CFO, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor

internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Hamner breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

137.    Additional reasons that demand on Defendant Mozingo is futile follow. Defendant Mozingo has served as a Company director since February 2020. She also serves as Chair of the Environmental and Social Committee and as a member of the Risk Committee. In addition, she receives substantial compensation for her role as a Company director as detailed above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Mozingo breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

138.    Additional reasons that demand on Defendant Murphy is futile follow. Defendant Murphy has served as a Company director since February 2022. She also serves as a member of the Ethics Committee, the Nominating and Corporate Governance Committee, and the Environmental and Social Committee. In addition, she receives substantial compensation for her role as a Company director as detailed above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Murphy breached her fiduciary duties, faces a substantial

43

likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

139.    Additional reasons that demand on Defendant Pitman is futile follow. Defendant Pitman has served as a Company director since 2018. She also serves as Chair of the Nominating and Corporate Governance Committee, Chair of the Risk Committee, as a member of the Ethics Committee, and as a member of the Environmental and Social Committee. In addition, she receives substantial compensation for her role as a Company director as detailed above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Pitman breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

140.    Additional reasons that demand on Defendant Sparks is futile follow. Defendant Sparks has served as a Company director since 2014. He also serves as a member of the Audit Committee, Compensation Committee, and Investment Committee. In addition, he receives substantial compensation for his role as a Company director as detailed above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he served as a member of Medical Properties' Audit Committee and, in that capacity, he failed to oversee, *inter alia*, the integrity of the Company's financial statements, the Company's internal control over financial reporting, and the

effectiveness of its disclosure controls and procedures, as he was required to do under the Audit Committee Charter. For these reasons, Defendant Sparks breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

141.    Additional reasons that demand on Defendant Stewart is futile follow. Defendant Stewart has served as a Company director since 2016. He also serves as a member of the Environmental and Social Committee, Compensation Committee, and Ethics Committee. In addition, he receives substantial compensation for his role as a Company director as detailed above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Stewart breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142.    Additional reasons that demand on Defendant Thompson is futile follow. Defendant Thompson has served as a Company director since 2016. He also serves as a member of the Audit Committee and Investment Committee. In addition, he receives substantial compensation for his role as a Company director as detailed above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he served as a member of Medical Properties' Audit Committee and, in that capacity, he failed to oversee, *inter alia*, the integrity of the Company's financial

statements, the Company's internal control over financial reporting, and the effectiveness of its disclosure controls and procedures, as he was required to do under the Audit Committee Charter. For these reasons, Defendant Thompson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143.   Additional reasons that demand on the Board is futile follow.

144.   The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and its shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

145.   The Audit Committee Defendants, consisting of Defendants Dawson, Sparks, and Thompson, served as members of Medical Properties' Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for, *inter alia*, overseeing accounting and financial reporting processes, and reviewing and discussing with management major issues regarding accounting principles and financial statement presentations, as well as major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies. The Audit Committee Defendants failed to adequately oversee the Company's reporting processes, failed to remediate major issues regarding accounting principles, financial statement presentations, and identify or remedy deficiencies with the Company's internal controls, and failed prevent the Company from issuing false and misleading financial statements with the SEC.

Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested or independent, and demand is excused as to them.

146.    The Directors violated the Code of Conduct, Company policy, the Guidelines, the Audit Committee Charter, and the Company's other corporate governance documents by engaging in or permitting the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, violations of the Exchange Act, and failing to report the same. Further, in violation of the Code of Conduct and the Company's policies, the Individual Defendants failed to maintain internal controls, failed to maintain the accuracy of Company records and reports, and failed to comply with applicable laws and regulations.

147.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for the Company the damages the Company suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

148.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of

exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

149.    The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

150.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of the Company. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Directors or certain of the officers of the Company, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

151.    If there is no directors' and officers' liability insurance, then the Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

152.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the
Securities Exchange Act of 1934**

153.    Plaintiff incorporates by reference and realleges each and every allegation set
forth above, as though fully set forth herein.

154.    The Individual Defendants participated in the scheme to defraud with the purpose
and effect of defrauding Medical Properties. Not only is Medical Properties now defending
claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated
thereunder, but the Company itself is also one of the largest victims of the unlawful scheme
perpetrated upon Medical Properties by the Individual Defendants. With the price of its common
stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the
Individual Defendants caused the Company to repurchase thousands of its own shares at
artificially-inflated prices, damaging Medical Properties.

155.    During the Relevant Period, the Individual Defendants also individually and in
concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce
and/or of the mails, engaged and participated in a continuous course of conduct designed to
falsify the Company's press releases, public statements made in conference calls, and periodic
and current reports filed with the SEC.

156.    The Individual Defendants employed devices, schemes, and artifices to defraud
while in possession of adverse, material, non-public information and engaged in acts, practices
and a course of conduct that included the making of, or participation in the making of, untrue
and/or misleading statements of material facts and/or omitting to state material facts necessary
in order to make the statements made about Medical Properties not misleading.

157.    The Individual Defendants, as top executives and directors at the Company, are
liable as direct participants in the wrongs complained of herein. Through their positions of
control and authority as directors and officers of the Company, the Individual Defendants were
able to and did control the conduct complained of herein and the content of the public statements

disseminated by Medical Properties.

158.   The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

159.   By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

160.   Plaintiff, on behalf of Medical Properties, has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

161.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

162.   The Individual Defendants, by virtue of their positions with Medical Properties and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Medical Properties and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Medical Properties to engage in the illegal conduct and practices complained of herein.

163.   Plaintiff, on behalf of Medical Properties, has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

164.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

165.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

166.     Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

167.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breaches of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the Company's rights and interests.

168.     In breach of their fiduciary duties owed to the Company, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Recap Transaction was subject to regulatory approval by the DMHC; (2) the DMHC had placed the Recap Transaction on hold; (3) accordingly, the Company had misrepresented the regulatory process for the approval of the Recap Transaction; (4) due to the foregoing, the Company overstated the approval prospects and benefits of the Recap Transaction; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

169.     The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

170.     Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls and effective disclosure controls and procedures.

171.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

172.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

173.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, the Company has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

174.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Unjust Enrichment

175.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

176.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

177.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance or artificially inflated valuation of the Company, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

178.    Plaintiff, as a shareholder and representative of the Company, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary and contractual duties.

179.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Abuse of Control

180.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

181.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

182.    As a direct and proximate result of the Individual Defendants' abuse of control,

the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

183.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

184.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

185.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly-held corporation.

186.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained, and will continue to sustain, significant damages.

187.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

188.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

## SEVENTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

189.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

190.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

191.   In addition, the Individual Defendants caused the Company to repurchase shares

of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

192.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused the Company to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

193.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

194.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## EIGHTH CLAIM

### Against Defendants Aldag, Hamner, and Hanna for Contribution Under Sections 10(b) and 21D of the Exchange Act

195.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

196.    The Company and Defendants Aldag, Hamner, and Hanna are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Aldag's, Hamner's, and Hanna's willful and/or reckless violations of their obligations as officers and directors of the Company.

197.    Defendants Aldag, Hamner, and Hanna, because of their positions of control and authority as the Company's CEO, President, and Chairman of the Board, CFO, and CAO, respectively, were able to and did, directly and/or indirectly, exercise control over the business

and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

198.    Accordingly, Defendants Aldag, Hamner, and Hanna are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

199.    As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Aldag, Hamner, and Hanna.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Medical Properties, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to the Company;

(c)    Determining and awarding to the Company the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing the Company and the Individual Defendants to take all necessary actions to reform and improve the Company's corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or

Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

    1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

    2.  a provision to permit the shareholders of the Company to nominate at least four candidates for election to the Board;

    3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

    (e)    Awarding the Company restitution from the Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: December 18, 2023

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
Saadia Hashmi
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
          eitank@bgandg.com


*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Kunihiko Kanno, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 12 __ day of December, 2023.

DocuSigned by:

*Kunihiko Kanno*

AED7DDDAD765441...

Kunihiko Kanno